## WILLIAMS *v.* THE STATE.

1. The evidence tending to connect the accused with the homicides other than that for which he was indicted was admissible as tending to show a motive, plan or scheme to commit the crime for which he was on trial.

2. In view of all the pertinent evidence submitted, and the instructions given in the general charge, it was not error to refuse a written request to charge the jury that "the existence of a motive on the part of the defendant to commit the crime with which he is charged in and of itself would not be sufficient corroboration of the testimony of an accomplice, so as to authorize the jury to convict the defendant upon such testimony alone."

3-4. The testimony of the witness Manning, set out in the 17th and 19th grounds of the motion for a new trial, and that of the witness Johnson, set forth in the 19th, 20th, and 21st grounds, was not inadmissible for any of the objections urged thereto.

5. The testimony of Manning as set out in the 25th ground of the motion was not subject to the objections made.

6. The requests to charge as to alibi, and as to the corroboration of an accomplice, stated abstract principles of law on these subjects, which were fully covered by the general charge given; the refusal to give such requests was therefore not error.

7. The court (in accordance with the ruling in *Montford* v. *State,* 144 *Ga.* 582, 584 (2), 87 S. E. 797) correctly instructed the jury as to the law relieving one of guilt who participates in the commission of a crime by reason of coercion practiced upon him of such nature as to excite in his mind a reasonable fear that his life or member is in danger. There was evidence to authorize such instruction.

8. The brief for the plaintiff in error states that "The charge complained of in the 23rd ground of the amended motion is error as pointed out, if the evidence of the various homicide is inadmissible; otherwise the charge seems to fairly point out the applicability of the

evidence of these other homicides to the case then on trial." As we hold the evidence of the other homicides to be admissible, this grounds needs no further discussion.

9. As to the 24th ground of the motion the brief for the plaintiff in error says: "The evidence the admission of which is complained of here is governed by the principles, considerations, and citations contained in the discussion in the 17th ground of the amended motion; and it is deemed unnecessary to repeat these matters here." We have ruled against the movant as to the complaint in the 17th ground.

10. The evidence authorized the verdict. The refusal of a new trial was not error.

No. 2629. JANUARY 12, 1922.

Indictment for murder. Before Judge Hutcheson. Newton superior court. May 7, 1921.

During the March term, 1921, of Newton superior court John S. Williams and Clyde Manning were jointly indicted for the alleged murder of Lindsey Peterson, on March 19, 1921, previously to the finding of the bill, by weighting his body with a sack of rocks and drowning him in Yellow River, in that county. The State, on the trial, elected to exercise its right of severance, and placed the defendant, John S. Williams, separately on trial. He was found guilty, and, on recommendation of the jury in their verdict, was sentenced to life imprisonment in the penitentiary. He moved for a new trial, which was refused, and he excepted.

On the trial the testimony of the witnesses for the State was substantially to the following effect:

George W. Brown testified that he was a special agent of the United States Department of Justice. As such agent, in company with A. J. Wismer, who held a similar position, he had occasion, on Friday, Febuary 18, 1921, to visit the home and plantation of the defendant, John S. Williams, in Jasper county. When they arrived the defendant was not at home. Three negroes, Clyde Manning, Johnnie Williams, and John Brown, were there. The witness talked to the three negroes together and separately, and while he was talking to John Brown the defendant came up in his car. The witness informed the defendant who he was, and that he and Wismer were there to make an investigation to ascertain if the defendant had violated the laws of the United States in regard to peonage. The defendant informed the witness that he would be glad for him to make any investigation he desired. Witness stated to the defendant that he wished to see the defendant's sons, Huland, Marvin, and Leroy, and asked where they lived. Upon witness

stating that he desired to visit the farm of Huland Williams, one of defendant's sons, the defendant stated that he would be glad to take him there in his automobile. Thereupon the witness and Wismer were taken by the defendant to the farm where Huland resided. The witness talked privately to Fletcher Smith, Charley Chisholm, and Johnnie Williams. The farm on which Huland Williams resided was some five or six miles from the home of the defendant. The witness found on both farms buildings so constructed and arranged as to cover a number of persons under one roof, with bunks for sleeping, one above the other in one apartment; and the door and shutters were so arranged that they could not be opened from the inside, but were under the control of a person occupying another room or apartment. The defendant carried the witness and Wismer back to his home in his automobile. The defendant said to witness "that he might have violated the peonage law, but, if he did, he did it unintentionally; and he stated that he had worked some stockade negroes on his place, and while he had worked them he instructed them that they must not leave his place until they had paid him back what he had paid out for them. He stated that he had got those negroes from Macon and Atlanta stockades." He said that his son, Huland, got Johnnie Williams from the Atlanta stockade. He told the witness that most of the stockade negroes were gone. He denied that he was keeping the stockade negroes there against their will, but said he told them not to leave until they had paid their fines. He said none of them were kept locked up on his place. The witness said: "I told him our information was that Clyde Manning on his place kept them locked up, . . and that on Huland Williams' place Claud Freeman was the man who kept them locked up. He denied that; said they didn't keep them locked up." The defendant stated that "he might have technically violated the law; he said if he had, if we would let him off, he never would do it in the future." On account of this statement witness did not swear out a warrant against the defendant.

The testimony of A. J. Wismer was in all material particulars practically the same as that of George W. Brown.

Clyde Manning, a negro, jointly indicted with John S. Williams, testified in behalf of the State substantially as follows: He was 27 years old, and had worked for the defendant, Williams, for the past 13 years. Some years he worked for money wages, and others for a

part of the crops. For the years 1920 and 1921 he worked for money wages. During these two years witness lived on the defendant's home-place, about one hundred yards from his dwelling. Witness's wife lived with him and cooked for the defendant and his family. In the spring of 1921 the defendant's family living with him consisted of his wife and seven minor children. His grown sons, Huland and Leroy, lived on a plantation about five miles from the defendant's home-place. Marvin, another son, lived on a plantation adjoining that whereon Huland and Leroy resided. Witness was present when Brown and Wismer, agents of the United States Government, visited the home of the defendant. Johnnie Williams and John Brown, negroes, were also there. The agent, George W. Brown, talked to the witness and to Johnnie Williams and John Brown together, and also privately and separately. Witness went with the agent Brown behind a gear house, and he asked witness if he was boss over the stockade negroes on the defendant's place. Witness replied that he was not; and Brown told him, if the defendant was guilty of peonage, and if witness was bossing the negroes and keeping it secret and helping· to commit peonage, then witness was just as guilty as the defendant. Agent Brown took Johnnie Williams around behind the house and talked to him privately out of the hearing of the witness. The defendant was not present when the two agents arrived at the defendant's home, but returned there some time afterwards probably an hour. After the agents left, the defendant asked the witness and the other two negroes, Johnnie Williams and John Brown, called "Red," what the agents asked them; "and we told him they asked us about a boy named Blackstrap, and he asked us what we told them, and we said we told them we didn't know any one named "Blackstrap." He didn't seem to be satisfied with Johnnie and what we told them, and he said, 'If you aint told it all, if you all told anything, I will find it out on you.'" Blackstrap "was a boy that Mr. Marvin got last year. I don't know nothing about Blackstrap. He was not there very long before he was killed. He was killed there at Mr. Johnnie's [the defendant's] house, under a little shelter there in the yard by his house, there in the yard." "Johnnie Williams was present when Blackstrap was killed," which was several months before the visit of the government agents.

After the visit of the government agents to the defendant's home, and during the following week, and before any one was killed, the defendant came to the witness and said, " Clyde, it won't do for these boys to go up yonder and swear against us; they will ruin us. . . We will have to do away with them." Witness replied to the defendant, " Mr. Johnnie, that is so bad I don't want to do it," and the defendant said, " You must do it; . . if you don't want to do it, it is all right, it is your neck or theirs. If you think more of their necks than you do of your own neck, it is yours." Further quoting the witness: " I had lived with Mr. Johnnie Williams continuously since I went there with him. I lived in the house with the stockade hands that he got and brought to the place. After he went and got them he would put them in the house with me. They stayed in the house with me. All the windows in the house were nailed up but one, and all the doors were nailed up but one. They had only one door to go in, and you could shut the windows; they had doors to them; they all, me and them, went in the same door. When we went in the door and shut the door, then I would take a chain and put it around through the door and hook it over in my room. There was a partition between the room they stayed in and the room I stayed in, and one door shut the whole house. There was one outside door shut the whole house, and the windows that were in there were fastened up, nailed, so that you could fasten them outside, you couldn't open them from the inside." On the Saturday night Lindsey Peterson was drowned neither he, Preston nor Price (called " Foots ") nor any of the other stockade negroes was living with the witness in the stockade house. Among the stockade negroes living on the plantations where the defendant and his sons resided were, Johnnie Williams, John Brown (called " Red "), one called " Little Bit," Big John, Lindsey Peterson, Will Preston, Henry Price (called " Foots "), Johnnie Green, Willie Givens, Charlie Chisholm, and Fletcher Smith. They are all dead.

On Saturday of the week next after the government agents made their visit, Lindsey Peterson, Will Preston, and Henry Price (called " Foots "), and other stockade negroes were working on the plantation where Huland and Leroy Williams lived. The defendant went to that place where they were at work, and in the presence of witness asked Peterson, Preston, and Price if they

desired to go home.  They replied that they did; and defendant told them to stop work in time to drive some hogs down to his home-place, and he would take them to the railroad station that night, or next morning, so that they might go home.  They drove the hogs to the defendant's home; and the defendant told the witness, Peterson, Preston, and Price, and Charlie Chrisholm, who was also at the defendant's house to go to supper in defendant's kitchen.  They all ate supper there as directed.  Before eating supper  (quoting the witness)  " he [the defendant] told me then, ' After you all eat supper go on down to your house.  I will come down there.'  After we got through eating supper he says, ' I am coming down there; we have to do away with them boys.' "  After supper the witness, Lindsey Peterson, Will Preston, Harry Price, and Charley Chisholm went to the house of the witness, and about eight or nine o'clock the defendant came there and knocked at the door.  When it was opened, (quoting the witness) " he told them boys he would carry them to the train, that he had to carry Johnnie Green and Fred Favers to the train in the morning, and he would not have so much time to do it then; and he told them to come on and he would take them to the train that night.  The car was setting under the shelter, and we went up and got in the car.  Harry Price got in the front seat with Mr. Johnny [the defendant], and then me and Will Preston and Lindsey Peterson and Charlie Chisholm got in the back seat, and we left then going to the river.  He [the defendant] said to them he was going to take them to the train that night, Lindsey Peterson and Will Preston and Foots, [Harry Price].  They had come from the stockade, and he was going to turn them loose and they could go home, he would take them to the train, and that would be the end of their service with him; that is the way of it.  He didn't say what railroad station he was going to take them to.  He give as his reason he had to take two in the morning.  I heard Mr. Williams tell them boys he had to take two men to the train the next morning, and he would take them that night while he had a chance; and they agreed to the statement and went and got in the automobile.  The two that he was going to take to the train in the morning was Johnny Green and Fred Favers.  He did not take them to the train the next morning; he had not taken them at that time.  I seen them after that time."  The car was a seven-passenger Chan-

dler, and was the only car the defendant had. Witness could not drive a Chandler, but could drive a Ford. Lindsey Peterson, Will Preston, and Harry Price (called "Foots") were all obtained from the Macon stockade, and lived on the place with Huland and Leroy Williams, the sons of the defendant. Charlie Chisholm also lived there. He came from the Monticello jail. They took him out on bond, and he had lived with them ever since. When the witness, Peterson, Preston, and Price (or "Foots") got in the Chandler car with the defendant at his home, witness saw in the car some trace-chains, wire, and a sack of rocks weighing about one hundred pounds. The defendant drove the car. (Quoting witness) "Those men were thrown into the river from that bridge that night; there was a chain, it was a trace-chain, around their necks, the necks of Will Preston and Lindsey Peterson. They were chained together; and Harry Price, he had a chain around his neck too, and he was begging, begging not to kill him, talking and begging of Mr. Johnny not to kill him. Lindsey Peterson and Will Price, they didn't think he was going to do anything to them, until we got to the river. When we got to the river, Mr. Williams told Lindsey Peterson and Will Price to get out and then he told me and Charlie Chisholm to throw them over. The chain was put around their necks between what they call Polk's store and the bridge. After we put the chain around their necks, then he drove the car on off and went on over to Yellow river, and at Yellow river he stopped the car and told Lindsey Peterson and Will Preston to get out. When they got out of the car, they had this trace-chain around their necks and the weights were tied to it; it was a weight of rocks in a sack. I didn't see the rocks but I saw the sack, and they were rocks in the sack. I lifted the rocks in the sack, I lifted the sack with the rocks, and my best knowledge is that it weighed 100 pounds; it looked like to me. The chain was around their necks, and the weight, the sack with the rocks, was tied up to that chain that was around their necks, the chain was, and their hands were tied together with wire like this (indicating); and when Mr. John S. Williams stopped the car on the bridge there on the river, and told them to get out and they got out, and me and Charlie Chisholm taken them on to the banister of the bridge, and they were scuffling and trying to keep back, to keep from going over, and he told me to push them over.

We taken them there and we throwed them over, and then we got in the car and left there. Before me and Charlie Chisholm threw them over the railing of the bridge their hands were tied together with the wire, right this way (indicating), this one's hands were tied together, and that one's hands were tied together, and then the hands were fastened to each other. Each man had his hands tied together with wire, and then the hands of both men were tied together with wire, and the necks of the two men were tied together with a trace-chain, and the bag of rocks, it was fastened to the trace-chain, sorter between the two. That bag of rocks was tied right up to the trace-chain, the sack was tied up pretty near the trace-chain, the sack was tied right up to it, and that sack was above their feet, and up above the floor of the bridge. They were not tied in any other way. Me and Charlie Chisholm was helping Mr. Johnny; and when we got there and he made them get out of the car, then we throwed them over the banister of the bridge; we throwed them into the river, right about the middle of the river, along about the middle of the river, from the bridge. After we throwed them over, I never saw or heard anything more of them until they come to the top, not until after they found them in the river. After we threw them over, that was the last I saw of them that night. Mr. Johnny, he handled the sack of rocks after it was tied to the chain in reaching the banister of the bridge, before they were thrown over. We put them out of the car and carried the sack to the banister; he helped take the men out of the car and carry the men to the banister; he carried the sack of rocks that was already on the men. After the sack of rocks were tied to their necks, between the time the rocks were fastened to the chain around the necks of the men, I held the rocks up off of Harry Price's neck. After we fastened the sack of rocks to Lindsey Peterson and Will Preston's neck, it was laying in their laps in the car. After they got out of the car and over the bridge to the railing where they were thrown over, Mr. Johnny Williams was carrying the rocks, he held the sack of rocks up. Mr. Williams drove that car with those men, Lindsey Peterson, Harry Price, and Will Preston (that is 'Foots'); he drove the car to the bridge where they were thrown over. It was a seven-passenger Chandler. It was his car. It come from his house. The men that started from his house in that car was Charlie Chis-

holm, Harry Price, Lindsey Peterson, Will Preston, and me and Mr. Johnny Williams. None of us, nobody that I have named, left the car before we got to the bridge. Me and Charlie Chisholm put chains around their necks and tied the sack of rocks to the chain, and their hands together. Mr. Johnny Williams told us to do that; and when we started from his house it was about 9 or 10 o'clock, I reckon, in the night. We left from right at his house; the car sat right at the edge of the yard, right across the road in front of the house, and that is where the car started from, and the trace-chain with which they were tied was in the car, and the wires with which their hands were tied was in the car, and the rock was in the car, in the back part of the car, the trace-chain and the rocks and the wire was all in the car. They were in there when we got in the car, we got in to go, they were there; the chains were put around their necks and their hands tied and the sack of rocks tied to them between Water's bridge and Polk's store; and Mr. John S. Williams told us to do that. There were only two that were thrown from the bridge into the water in the river at that place, and the other man was in the car. The third man left Mr. Williams' house in the car, and was put into South River.

"After we had thrown Lindsey Peterson and Will Preston off the bridge into Yellow River, then we got in the car and went on to South River and carried Harry Price, nicknamed ' Foots,' and put him into South River; that is about a mile, or may be more, from the Yellow River bridge, not so very far. There was a bridge there. That was a pretty good sized stream, too, it is a little bit larger than Yellow River. Mr. Johnny Williams drove the car from Yellow River bridge to South River bridge. In the car then was me and Harry Price, Charlie Chisholm, and Mr. Johnny Williams. When we got to South River he told us, ' All right, boys, get out.' We got out, and Harry Price he got out, and I taken the weight that he had to him, and he says, ' Don't throw me over, I will get over.' The weight was around his neck, it was put on at the same place as the other boys; between Polk's store and Water's bridge, a sack with rocks in it. It was put on him when the other sack was put on the other boys. When we got to South River Mr. Johnny told us to get out boys, and we got out, me and Charlie Chisholm, and we got to the edge of the bridge, and Foots says, ' Don't throw me over,' and he crawled up on the banisters, set

up on the banister, he set there just a little while, and he says, 'Don't throw me.' He says, 'Lord, have mercy,' and went right on over. His hands were tied, too, and the weight was tied to his neck. His hands were tied together, sort of that way (indicating) with a piece of wire. I never seen any more of him after he went over into the river. He set up on the rail of the bridge, right about the middle of the bridge, that was on the upper side of the bridge, the upper-stream side. When he was thrown over, the car was standing on the bridge, right where he went over. All who had anything to do with throwing, or pushing, or making them jump in the river was just me and Mr. Johnny and Charlie Chisholm. I held the weight up off of Foots' neck when he got up on the banister; when he got up there he says, 'Lord, have mercy,' and jumped right off. That weight was fastened around his neck by a chain, it had a ring in it, and the chain was run through the ring and fastened with a horseshoe and the sack of rocks was fastened to the chain; the horseshoe was run through a link of the chain, and the chain had the sack of rocks attached to it. Mr. John S. Williams was right there with us when he went off the bridge into the river, right there by us; he was not doing anything. When we left Yellow River he didn't tell me where he was going; he just says, 'Come on, let us go over to the other river,' and Mr. Johnny was driving himself; he didn't have to tell us where to go; he was driving. When we got to South River bridge he says, 'All right, boys,' and me and Charlie Chisholm and Foots got out, and when he got out I caught hold of the sack of rocks, and Foots says, 'Don't you all throw me over; I will get over.' Harry Price says that; and as he jumped off, I turned the rocks loose, and then we got in the car, me and Charlie Chisholm and Mr. Johnny, and went up the road on the other side of the bridge, and he turned around and we come back home, went straight back home. I reckon it was somewhere about 11 o'clock when we got back home. I never seen Harry Price after that. He was found after that, his body was. I never did see him after he was found, but I seen his shoes. I knowed his shoes. I don't know what condition he was in when we drove away from the bridge, whether he sunk down in the water. As soon as he jumped off I didn't look to see whether he sunk in the water or not, and I never did see him again. I seen his shoes. But I seen the body of Lindsey Peter-

son; I seen it down there by Yellow River bridge; and I seen the body of Will Preston, there with Lindsey Peterson; it was about two weeks after they were throwed in the river, I reckon, two weeks afterwards. I seen the bodies of Lindsey Peterson and Will Preston in the graves right there at the bridge, where they were thrown in."

Further testimony of the witness Manning was to the following effect: Johnny Williams was living with the defendant, and came from the Atlanta stockade about the first of the year 1920, and had since worked for the defendant. Witness gave the following account of the homicide of Johnny Williams: "Johnny Williams was killed about dinner-time in the pasture near Mr. Williams' house; that was in Jasper county. I was there and I saw it. He told Johnny Williams to drive the cows down in the pasture, and he told me to go get the ax, he had some poles down there he wanted me to cut up. I got the ax, and he told me he wanted me to kill Johnny. He told me that before he ever told Johnny to drive the cows down in the pasture; he told me that the day before then. When he told me to do that, I knowed I had to do it to save my own self. I got the ax, and he told me to go down and cut some poles in the pasture. Mr. Williams went with me and Johnny down in the pasture, and when we got down there he told me to hit him; and he kept backing around, I didn't want to hit him; he was begging and going on, and I didn't want to hit him; and he asked me, didn't I mean to do what he said? he said, if I didn't to give him the ax; he meant what he said, and I was afraid to give him the ax, and so I hit him with the ax, hit him one lick on the back of the head, sort of side of the head with the back of the ax, and then we dug a hole there. We dug a hole in the side of the gully; there was a little gully come into a big gully, drained into it, and we dug a hole in the side of the gully and put him in it and covered him up there. That was about the middle of the week when these two were put in Yellow River and one in South River that incoming Saturday night. It was about the middle of the week that Johnny Williams was killed, them three was put in the river."

The substance of the testimony of Manning, as to the killing of John Brown (called " Red ") and a negro named " Little Bit," was as follows: They were both stockade negroes. " Red," who was

from the Macon stockade, lived on the defendant's home-place. "Little Bit," from the Atlanta stockade, lived on the place where Huland and Leroy resided. These two negroes were drowned after the visit of the government agents, and before the drowning of Peterson, Preston, and Price. The defendant had the witness to go with him to the Huland place. "He said he was going to do away with John Brown and Little Bit; he didn't say why; he had done told me why he was going to do so with all of them; he didn't tell me why then; he never told me why he was going to do away with them any more than he had done told me." The defendant said to "Red" and "Little Bit" that he would take them over to Jackson, and they could go home, or wherever they wanted to go. The defendant took them, Charlie Chisholm, and the witness in his car and drove away as if going to Jackson. This was about 9 or 10 o'clock at night. The defendant directed Charlie Chisholm and the witness to tie "Red" and "Little Bit." He told "Little Bit" that he did not intend to hurt either of them, but just wanted to scare "Red," and had "Little Bit" help the defendant to tie the weight to "Red," and when this was done the defendant tied "Little Bit" to "Red." They were tied around the neck, and ".The weight that was tied to those two men was a big old iron weight, a big old thing off a press." The defendant drove to Water's Bridge on the Alcovy river and stopped the car on the bridge, and "Red" and "Little Bit" were thrown from the bridge into the river. The river was deep enough to drown them. The witness never saw them or their bodies afterwards.

(Quoting the witness, Manning) "Big John, he was killed; that was a fellow from the Atlanta stockade. I never knew any name but Big John. He lived with Mr. Marvin Williams. I know he was killed with an ax . . at Mr. Huland's, . . before Lindsey Peterson and the others were thrown in the river. That was the next week after Mr. Brown, the government agent, was there. . .. The way Big John was killed, Mr. Johnnie [the defendant] told me and Charlie Chisholm to go over by the new house and dig a hole, like we were digging a well he was going to kill Big John, and he was going to let Big John get down in there and go to digging, and one of us was to knock him in the head; and me and Charlie Chisholm got Big John and went over there and dug the hole, and Mr. Johnny told Big John to get down in

the hole and dig. . . Charlie crawled out of the hole, and Big John got in. I was already out of the hole. There couldn't but one of us dig at a time. That left Big John in the hole by himself; and Charlie, he taken the ax and hit him right along there [indicating], and he fell over, right doubled over; and we just covered him up right there, wrapped him up, and taken the shovels and filled the hole back up. I saw his body after that. I saw it there in the hole. We took the tools we were digging with and set them in the stove-room, right in the house where we dug the hole. . . I don't remember the day or the week that Big John was killed. It was before them were drowned in Yellow River. That was all that was killed before Lindsey Peterson, and Preston and Price was drowned in the river, to my knowledge."

On Sunday morning after the Saturday night when Preston, Peterson, and Price were drowned, Johnnie Green, who was from the Macon stockade, was killed. On the day before Green was killed the defendant told him that he (defendant) had to go to Jackson, and for Green to come down to defendant's house on Sunday morning and he would carry him to the train so he could go home. Johnnie came down early that Sunday morning, and the defendant sent him down to the pasture to fix up the pasture wire, and defendant went with him. (Quoting witness) " When we got down in the pasture he [the defendant] told Johnnie he heard he was going off to try to have his boys' necks broke, and he said he was going to stick to his boys, and he told me to hit him; and when he said that, I hit him, and then he told me to hit him again; when he told me to hit him again I hit him again with the ax; . . then we covered him up in some pine straw and just left him there until that Sunday night. . . Then that Sunday Mr. Johnnie [the defendant] told us. to take Willie Givens, that same Sunday, down in the pasture and to kill him and to cover him up. We killed Givens after we killed Green; the same day, but later in the day. Mr. Johnnie told me and Charlie and Willie Givens to go down there, that he was going over to the store, Homer's store, and for us to go down to the pasture with Willie Givens and to knock him in the head. I knocked him in the head. After I knocked him in the head we left him lay there and covered him up with pine straw, and left him there until that Sunday night, and that Sunday night we went back down there and dug

two holes and put Willie Givens in one and Johnnie Green in one, and covered them up and taken some pine straw and scattered it over that place where they were put. Them two were killed right close together, and buried right close together. Mr. Johnnie Williams [the defendant] was with us when we killed Givens and with us when we killed Green, and was with us when we buried them, and helped to bury them. I saw those bodies afterwards; they were where me and Mr. Williams and Chisholm had buried them, and they were the same people."

(Again quoting witness) " Charlie Chisholm he was killed too. Charlie Chisholm had helped kill Johnny Willams, John Brown, Little Bit, Big John, John Green, and Willie Givens. He had helped us kill all of them. Charlie Chisholm had helped to drown Peterson, Preston, and Price, besides these others. He [defendant] told Charlie Chisholm that Saturday evening he was going to send him off, and Saturday night he taken me and Charlie in the car. Mr. Johnnie Williams, taken us with him, and when we got mighty near to the Alcovy river he told Charlie he heard some of his smart talk, and Charlie told him he hadn't said nothing, and he told him, ' Hush, I don't want to hear a word from you ;' and he told me to tie him, and I tied a weight to him, tied to his head and a weight to his feet, and when we got to the river we put him over the banister near the middle ways of the river and turned him loose. The water was deep enough there to drown him, and it did drown him. I never did see him afterwards, but they found him the same day we were down there. That was Saturday night." That was the next week after Peterson and Preston and Price were drowned.

Fletcher Smith was killed the next week after Charlie Chisholm was drowned. Fletcher was shot with a shotgun on Huland Williams' place. W̓tn°ss. Fletcher, and four others were at work plowing on th° Ʉꞑlꜵꞑꝺ p̓lace. The defendant came there and sent four of those at work off to do something else, leaving the witness, Fletcher Smith, and the defendant. (Quoting witness) " He told me to go down to the branch and get a spade and mattock and bring them up there; and he had a shotgun in his hand. He went across the field, and I went down to the branch; and when I come back to the little old road I heard the gun shoot, and when I got up there where they were Fletcher was dead. When I left there to

go down to get the spade and mattock, Fletcher was over behind the hill and Mr. Johnny was on this side of the hill, and Fletcher was out of my sight when I turned over the hill, and Mr. Williams went across over the hill from where we were to where Fletcher was, and that put him out of my sight, and I did not see him shoot Fletcher, but I left him there with a shotgun in his hand. When I went on back to where I left Fletcher and to where I heard the shot, and when I got there, Fletcher was dead and Mr. Williams was standing there, about as far from Fletcher as to the side of the wall, there, 10 or 15 feet, I reckon, just about that distance. I had come up then with the mattock and spade. Then Mr. Johnny dug with the mattock and I shoveled the dirt out. Mr. Johnny didn't say anything to me at that time when we were digging. When I got back there and Fletcher was dead and Mr. Johnny was standing there with the shotgun, all he said was, ' Let us dig it right here, dig the hole right here.' That was right by the body, and we dug the hole right there, a long hole like a grave, and Mr. Johnny he dug with the mattock and I shoveled it out. I throwed out the dirt, and he picked it up with the mattock. When we got it deep enough then we put Fletcher in and covered him up. After we got him covered up we plowed over him again and he says, ' Clyde, I don't want to hear nothing from this. There is nobody knows about this but just me and you.' He says, ' If I ever hear it come out I will know where it come from.' I says, ' Mr. Johnny, I ain't going to say nothing about it to nobody.' That was the last one killed to my knowing." The field where Fletcher Smith was killed was about a mile from Huland Williams's house.

Witness had no money interest in the defendan't business, had nothing to do with his business, and never hired any men nor paid any out of the stockade. He just worked for the defendant for wages. After the witness was arrested he went with the sheriff and others and identified the bodies of eleven men, but did not tell them what he knew as to the cause of their deaths. The witness did not wish to get rid of any of the men killed, as there was nothing about which they could hurt him. (Quoting witness) " I had to do what Mr. Johnny [the defendant] told me. I was afraid not to do it. I knew I had to do what he told me. . . When the boys [defendant's] come back from the war he hired me for wages. When they was gone and he hired me for wages,

he was looking to me to see after these hands, these men. When Mr. William's boys were in the war, he was boss himself, he didn't have anybody. I was not a boss then. I may have been called his boss for three or four years. I don't think it was four, but it was turning into three years. There were three plantations there. . . My boss job begun after the armistice was signed and his boys come home, and he got some of those stockade boys; he told me he was looking to me to see after them. His boys were there to see after their own boys; they had to see after their own farms. Mr. Johnny [the defendant] told me he was looking to me to see after them boys on his place. Nobody was compelling me to boss; he told me he was looking to me to look after them, and I told him, ' Yes, sir.' I didn't want to say ' no,' and I just proceeded to boss because I was afraid to say ' no.' Whatever he told me to do, if it was against my will I would go on and do it. I had been there 13 years. I was there long enough to find out you had to go ahead and do what he said, and I stayed there with him two or three weeks after the first killing happened. I stayed right on there with him, after this Yellow River killing, something like two or three weeks. I didn't try to leave. I was afraid to try to leave, and I didn't try to leave. I did try to leave once. I made a trade with Mr. Elston, and he jumped on to me about it, and I never did try to leave any more. I didn't try to leave, because I didn't want to have any more trouble with him. Mr. Williams told me we had to get rid of these boys. . . They have never told me the best thing I could do was to put it on Williams, and get off light myself; none of them told me nothing like that. That is not the real motive I am doing this for. I ain't putting no more on Mr. Williams than his part, and I ain't telling any more on myself than my part. I don't know nothing about getting off lighter, I don't know nothing only what they tell me. I don't know how it will be until after the trial. Nobody told me I would get off, and nobody told me I would get off light. . . I told the lawyers I had been down there to the bridge to see Peterson, he was in a swelled-up condi-. tion, his face was swelled, his body was swelled. I recognized him, as his body. I knowed it was him, and I knowed him by other things. I knowed how he tied his shoes. I knowed him by the shoes and the weights that were shown to me, and by his face; that is the way I recognized him."

33

Lessie May Benton, colored, testified in behalf of the State, as follows: At the time of the trial and in February, 1921, she was living on the place where Huland and Leroy Williams, sons of the defendant, resided. She cooked for them, and also for all "the hands" on the place, some of whom were Lindsey Peterson, Will Preston, Harry Price, Johnnie Green, Will Givens, Charlie Chisholm, Artis Freeman, and Fletcher Smith. Two government agents came to the place where witness lived. On Saturday about two weeks after they came was the last time witness saw Lindsey Peterson, Will Preston, and Harry Price. Witness saw the defendant on that Saturday on the place where she lived, as she was carrying dinner to the hands who lived there and for whom she cooked. She met him going towards the house where his sons lived; and all he said to the witness was to ask her if she had met Artis Freeman, and she responded that she had not seen him. Artis was not there for dinner, and "they said he was going home." Witness gave Lindsey Peterson, Will Preston, and Harry Price their dinners that day. Peterson went to the house to get a pair of shoes and a pair of overalls witness had patched for him. Huland's wife gave him a white shirt, and Peterson got on his mule and went back to the place where the hands were at work. She never saw him, Will Preston, and Harry Price afterwards.

Clyde Freeman, colored, testified as a State's witness, substantially as follows: Witness lives on the Huland Williams place. He has worked for the defendant and his boys for thirteen years, three years on the Huland place, and the balance of the time he worked for the defendant. Witness was at work on the Huland place on a Saturday in the early part of the year 1921, when the defendant came to where witness and other hands were at work, among them Peterson, Preston and Price. The defendant told these three, "he would let them go home if they wanted to go; they told him they wanted to go. Then Mr. Williams [the defendant] told them when they drove them hogs down there, to take them down that Saturday night, and then that Saturday night or the next Sunday morning he would let them go." They left the field about two hours by sun, and that was the last time witness ever saw them. About two weeks afterwards witness saw the dead bodies of Peterson and Preston near a bridge across a river, but he did not know the name of the river.

Rena Manning, colored, a witness for the State, testified in substance as follows: She is the wife of Clyde Manning, and lives with him on the defendant's plantation and cooks for him, and has been doing so for nearly two years. She knew Lindsey Peterson, Will Preston, and Harry Price, nicknamed "Foots." They lived on the Huland Williams place. But she had seen them at the house of the defendant. ( Quoting the witness ) " I remember the last time I seen them men, I could not tell you exactly, but it was the time they drove some hogs down to Mr. Johnny's house; that was the last time I seen them, down to Mr. John Williams's house.  I didn't see them drive the hogs, but I seen the hogs the next morning in Mr. Johnny Williams's lot, close to the house; the house sets on that side of the road and the lot is on that side [indicating]. My house was not very far from Mr. Williams's home-house, just down the road a little piece. The last time I seen them three men, Lindsey and Will and Foots, they went home with us from Mr. Johnny's house; it was Saturday night. They eat supper at the house and just come on down home with us; they eat supper at Mr. John Williams's house that Saturday, Charlie Chisholm, Harry Price, Will Preston, and Peters, and Clyde, my husband. I cooked supper at Mr. Williams's kitchen, and I got through washing dishes, and we all went home, down to my house, where I stayed at; all them boys and me made a fire and set down by the fire and was talking, and Mr. Johnny Williams come and knocked on the door, and Clyde opened the door and he told Clyde he wanted them to go off a piece with him. I seen Mr. Williams at the door. Clyde got up, and all them went on with him, all the boys that were in the house; they were Lindsey Peterson, Will Preston, and Foots, and Clyde, and Charlie Chisholm, all got up. I didn't know where they were going. After they went out I heard the car start up, and that is all I heard; it was a Chandler car. It sounded up towards Mr. Johnny's house. Mr. Johnny had a Chandler car, it come from the direction of his house; that was not very long after they left the house, the car started up just about the time they could go up there. I heard it crank up. I don't know whether it moved off or not. I heard the cranking up. The next after that I seen Clyde, he come back home. I guess it was about 12 o'clock. My clock wasn't running. I know I had been asleep. Charlie Chrisholm didn't come back with him, Harry Price, Foots, nor Will Preston;

none of them come back with him, and I never seen them afterwards, and I don't know where they went, and don't know what became of them." Witness further testified: "We hadn't been there [at her house] but about 30 minutes when the knock was on the door; that was Mr. Johnny Williams, who knocked on the door, I seen him. . . He didn't say anything about these other niggers going off with him. Clyde told these other niggers to come on. When he told them to come on they all went off together. They all went out the door. I don't know which way they went. I didn't go to see; it was dark. I know it was Mr. Johnny Williams who come to the door and knocked; the light was shining in the house, and he was standing in the door, and I could see him good. I don't know which way they went. I know they went out of the house, and afterwards I heard the car start, just about in time that they had to walk out of the house and get there, and then the car cranked up. I have seen the Ford car, and I know a Ford when I see one, and I have rode in them; and I seen the Chandler car and I have rode in it. I don't know all about it, but I know a Chandler car from a Ford when I see them. The Ford makes a louder noise cranking than the Chandler. I know that was the Chandler car cranking up that night; nobody told me to say it was. I heard it. I could tell the Chandler, the way it exhausted. I know that was the Chandler, and it was not a Ford, and I heard it. That is all I know about it. Clyde came back about 12 o'clock, I reckon. He said he had been to a party."

B. L. Johnson testified as a witness for the State, substantially as follows: He is the sheriff of Newton county. Part of Yellow River and Allen's bridge over it are in Newton County. The river at that bridge is a good-sized stream, and ordinarily there is water enough there to drown a man in. It is something like 12 or 14 miles from the defendant's home in Jasper county to Allen's bridge across Yellow River. Something like two weeks prior to the trial Clyde Manning was taken in charge by the witness, to be held as a material witness in the case. He was placed in jail, carried before the grand jury; and then he was taken down to Allen's bridge in Newton County, to see if he could identify some bodies that the witness and others had buried there. The witness and others "uncovered the bodies, and he [Manning] looked at them for the purpose of identifying them."

("As the result of the information we got from Clyde Manning we found five dead bodies. We carried this negro down into Jasper County on Mr. Williams's place, and in his pasture he pointed out three graves. After uncovering these bodies there and being identified as the bodies of the ones I have just told you, then he carried us four and a half or five miles, I judge, to a place they called the Campbell place and there he pointed out two more graves or places, and we uncovered them and he identified them. They were negroes. There were wounds on two of them that I noticed specially. They had wounds in the head. I could not tell whether the skulls were broken, but they had been hit in the head. . . It was a week ago last Saturday." The body of Fletcher Smith indicated that there was a wound on the side of his head. Witness did not examine it sufficiently to say whether the wound was made by a shot or a blow. The place where Fletcher Smith was buried was a cornfield, and the corn had been planted over him. The witness and others dragged the river at Waters' bridge, and found three dead bodies in the river. They were found about a week ago. One of the bodies had a sack of rocks tied to it and a trace-chain around the neck. The other two were tied together, and were weighted down with a big piece of iron.)

The witness saw the bodies found at Yellow River bridge, called Allen's bridge, and understood them to be the bodies of Lindsey Peterson and Will Preston. From the bodies they appeared to be good-sized men. The bodies were in a fair state of preservation; and if witness had known the men during life, he could have identified the bodies as theirs.

No other evidence was submitted by the State.

The defendant introduced no evidence, but made a statement to the jury, the substance of which was to the following effect: He would be fifty-five years old next October. He had a wife and twelve living children. He had always endeavored to be law-abiding, and had endeavored to train his children to be likewise. His four eldest boys were among the first to volunteer in the late war. All of them made fine records, and when the war closed were honorably discharged. Neither he nor any of his boys had ever been charged with the commission of crime. He owned a plantation in Jasper County, but not so large as

the newspapers had reported, and it could not now be sold for a sufficiency to pay his indebtedness. He, like most farmers he knew had done, at different times had paid the fines of negroes convicted of crime, or had gone on their bonds under actual contracts with them to work for him until the fines were repaid him, or until they had been discharged on the bonds. In many instances they had remained with him and worked for agreed wages. About two months prior to the trial, the Federal officers came to his place and stated that they were making investigations to ascertain if the laws against peonage were being violated. He told the officers that he would gladly give them all the information that he could, and would show them everything they desired to see; that everything was open, and they were at liberty to make the fullest investigation, and he would give them all the aid he could in doing so. He said to the officers that he would like to know the law of peonage, and one of them replied: " If you pay a negro's fine or go on his bond and work him on your place, he says you are guilty of peonage." Defendant replied, " Well, if that is the case, I and most of the people who have done anything of the sort are guilty of peonage." The officers stated that they desired to see several of the hands they named. He told them that those hands lived on the place of his son, Huland, and that defendant would go with them to that place and render them all the aid he could in whatever investigation they desired to make. He took the officers in his car and went with them to the Huland place, where they talked privately to a number of the negroes living there. When they were ready to return, the defendant took them in his car back to his home. He inquired of them their opinion as to the surroundings; and they replied that they were much better than they expected to find, that the negroes were well dressed and appeared to be well fed, and, while the defendant might be technically guilty of peonage, they thought he need not have any fear that a case would be made against him in the Federal court. No such case was ever made. The next morning, after the officers left, " I called all my hands. They were gathered around the woodpile up there, I called every one of them up. I says, ' Boys, all of you who want to leave, I want you to talk up.' I says, ' The Federal officers have been up here and got everything stirred up.' I says,

' What they say about peonage and all, if you want to stop right off you can do so, and you can give me any trouble you want to;' and I says, ' All of you who want to go, there is the road; you can just go right on off; you are at perfect liberty to go. It went on till Saturday at noon.  So Saturday I says, ' Boys, I am going to Jackson to day; all who want to go with me can go.' " One of them, Artis Freeman, said he wanted to go to see his folks, and defendant took him in his car as far as Mr. Bunny's.  Artis said he would like to return to the defendant, and requested defendant to meet him at McDonough to take him back.  Defendant promised to do this, but subsequently decided not to do it.  This was on Saturday.  Along about dark " Lindsey Peterson, Will Preston, and Foots come up driving some hogs, and they turned them in the lot, and in a little bit Clyde Manning and Charlie Chisholm . . come on in the wagon. . .  Well, Lindsey Peterson, Will Preston, and Foots, the three I mentioned, says, ' Mr. Johnny, we taken a notion we want to go and see our folks.' I said, ' That is perfectly all right.'  But they said, ' We want to come back.' I said, ' That is all right; if you want to go and come back, you can come back your-selves; that is perfectly all right with me.'  I gave each of them $5, and told them that I would take them to the train the next morning, if they wanted to go, and they said, ' All right.' "  Defendant had never seen Peterson, Preston, and Price since.  He gave Clyde Manning and Charlie Chisholm each a half dollar, as they said they wished to go to a supper.  Defendant's wife and small children were the only ones then at home.  Defendant then went into his house and remained there all night, never left it all night.  None of the negroes came up next morning, except Clyde Manning; and " I asked him where were the other boys, and he replied that they left last night, and hadn't returned."  Although they were owing the defendant, he had given them the money to go and return on, and had expected them to come back.  (Using the language of the de-fendant) " I heard down there in a few weeks that some negroes had been found in Middle River over there, and Eberhart said he knew the negroes, and knew they come from my place; so I heard. Like any other man I went to see Eberhart, and I says, ' Eberhart, I heard you said you knew these niggers and knew they come from my place,' and I says, ' If you did, I want to see them and see if they are my niggers, and if they are I can identify them, too.'  He

said, ' Mr. Johnny, I didn't know them and didn't make any such remark.' He said, ' You can ask the coroner.' I said, ' That is all right.' I said, ' If you said you knew them and thought they were mine, I wanted to investigate and see if they were niggers from my house.' So I went on over to Mr. Polk's store. I told them what I heard Eberhart said. Several of the jury, some one, said he didn't think Eberhart said that, he knew he didn't say that before the jury; he says, ' I don't hardly think any man could have known them; I could not have identified them.' I said, ' If they were from my house I would have identified them and did everything I could to catch the one who did it.' I said, ' If they were put in the shallow water they were put in there for a purpose; there is no question about that.' . . If I had done this crime, gentlemen, I would have certainly known them, and I had plenty of time, and I would have certainly have been plumb away from here where they could never had put their hands on me before any bills was got, after that gentleman over there was asking me the questions. I knew nothing about it. I don't know nothing about it, and I just simply don't mean to leave and never expect to leave or anything when I am falsely accused of anything." Clyde Manning and the whole Manning crowd are very cruel towards negroes. Defendant had to call him down, time and time again. (Quoting defendant) " As far as the case in Jasper, and these other cases, they are separate, as I understand, and distinct cases, and whenever they are called for trial I shall explain them to the satisfaction of the jury. I don't think it is necessary in this trial to say anything in regard to them. But whenever they are called I will certainly explain them." Clyde Manning has been cruel to his wife; has whipped her and run her off. He followed her over to the Andrew Newton place, and would have shot her had not his brother and sister knocked the pistol from his hand. " As far as the case I am on trial for now, I am absolutely innocent. I don't know anything about that at all. I didn't think anything about the negroes being gone till they found some; and I heard what Eberhart [was reported to have said], and I like any other man would have done, or you would have done, I wanted to know if the negroes were from my place."

*W. H. Key* and *King & Johnson,* for plaintiff in error.

*R. A. Denny, attorney-general, A. M. Brand, solicitor-general, Graham Wright, asst. atty.-gen.,* and *Callaway & Howard,* contra.

FISH, C. J. (After stating the foregoing facts.)

1. One ground of the motion for a new trial contains the entire testimony of Clyde Manning, a State's witness, and jointly indicted with the defendant on trial, John S. Williams, relating to the homicides of Harry Price, nicknamed " Foots," Johnnie Williams, John Brown, called " Red," " Little Bit," " Big John," Johnnie Green, Willie Givens, Charlie Chisholm, and Fletcher Smith. All of such testimony, as it appears in the brief of evidence in the case, is set forth literally in this ground. The material substance of it is exhibited in the statement of facts preceding this opinion. It is alleged in this ground: " Movant objected to the admission of such evidence at the time the same was offered, and did then and there urge the following grounds of objection thereto: (*a*) That such evidence is irrelevant. (*b*) That such evidence tends to show the commission of independent and distinct crimes and homicides not connected with the homicides for which the defendant is being tried. (*c*) Such evidence tends to multiply the issues and raise collateral issues which the defendant is not prepared and could not be prepared to meet, and is exceedingly prejudicial to the defendant. All of which objections the court then and there overruled, and admitted said evidence to the jury." In succeeding grounds of the motion the testimony of the witness Manning, relating to the homicide of each of the persons named in the foregoing ground of the motion and as contained in that ground, is separately set forth, and error is assigned upon the admission of Manning's testimony as to each of such homicides, over objections of the movant as stated in each ground, the objections being the same as specified in the ground relating to the admission of Manning's testimony as a whole in reference to all of the homicides except those of Lindsey Peterson and Willie Preston. In view of these grounds of the motion we deemed it advisable to fully set forth the material substance of Manning's testimony in reference to each of the homicides about which he was permitted to testify.

The general rule is, that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent from that for which he is on trial, even though it be a crime of the same sort, is irrelevant and inadmissible; but to this rule there are several exceptions. Among them is the admissibility of evidence showing or

tending to show the commission of crimes other than that for which the accused is on trial, for the purpose of showing motive, plan, or scheme. *Frank* v. *State,* 141 *Ga.* 243 (80 S. E. 1016), and authorities on the subject referred to in both the majority and minority opinions; *Hill* v. *State,* 148 *Ga.* 521 (97 S. E. 442) ; 12 Cyc. 405, 410 ; 1 Michie on Homicide, 714, § 166, Id. 843, § 172.

The contention of the State is that the testimony of the witness Manning as to the other homicides was properly admitted, because it tended to establish the motive of the defendant, and supply evidence of the scheme adopted by him to carry that motive into effect ; that his motive was to destroy the lives of those persons who could, in his opinion, be used as witnesses to establish his own guilt, or that of his sons, of peonage or murder ; and having formed the motive to secure himself from danger of this character, it became necessary, in order that his security might be complete, that every such person answering to the description of stockade laborers should be killed ; that one of such persons was as dangerous to him as another, and to kill one and leave the others alive would be a useless task. Therefore, that the motive might be, if put into execution, entirely effective, it involved the scheme of killing every person answering to the description of a possible witness against him for peonage ; and if this method of destroying testimony was to be effectual, it was to be executed as promptly as opportunity and other circumstances for secrecy might afford. Upon this theory of the State's case the testimony complained of in these grounds of the motion was properly admitted.

2. Error is assigned in the motion upon a refusal by the court of a timely written request to give in charge to the jury the following: " While evidence tending to show the existence of a motive on the part of the defendant to commit the crime with which he is charged is material and relevant in determining the guilt or innocence of the defendant, yet the court charges you that the existence of a motive on the part of the defendant to commit the crime with which he is charged in and of itself would not be a sufficient corroboration of the testimony of an accomplice, so as to authorize the jury to convict the defendant upon such testimony alone." The court in the general charge did instruct the jury as follows: " The jury will not be authorized to convict upon the testimony of an accomplice, unless that accomplice's testimony is

corroborated by other evidence in the case, either direct or circumstantial. While it is true that the sufficiency of the circumstances, for the purpose of corroboration, is a matter for the determination of the jury, and the law can not lay down a rule to measure the extent of corroboration necessary, still, where the only witness is an accomplice, the corroborating circumstances referred to must be such as to connect the defendant with the perpetration of the crime, and tend to show his participation therein. In order to convict the defendant upon the evidence of an accomplice alone, the corroborative evidence must tend to connect the defendant with the identical crime for which he is being prosecuted." Of course, motive of and by itself, without more, can not be sufficient evidence to authorize the conviction of one accused of the commission of the crime.

It is stated in 16 Cyc. 707, § 1443, that: "Evidence of the existence of a motive on the part of the accused to commit the crime with which he is charged is not sufficient corroboration" of the testimony of an accomplice. To support this statement the following cases are cited: People v. Becker, 210 N. Y. 274 (104 N. E. 396); Vails v. State, 59 Tex. Cr. 340 (128 S. W. 1117). In Becker's case syllabus 1 is: "Where accused's connection with the crime is established entirely by the testimony of confessed accomplices, evidence that accused had a motive for the commission of the crime, while important, will not of itself supply the necessary corroboration to sustain a conviction." In the opinion of the majority of the court, delivered by Hiscock, J., it was said: "There is no doubt that evidence of motive for the commission of a crime may be important, although it is perfectly well settled that it does not of itself supply the necessary corroboration required by the statute. But the evidence of such motive in this case is not very satisfactory." In the concurring opinion of Miller, J., it was said: "They [the facts set forth] do not singly or together tend to connect the defendant with the commission of the crime. They do furnish ground for argument on the question of motive, and they do show the defendant's relations with the 'gunmen' [who killed Rosenthal, the deceased]. Proof of motive is always of great importance; but it is a novel proposition to me that such proof in and of itself tends to establish the defendant's participation in the crime or supplies the corroboration of accomplices which the law requires. See People

*v*. Ledwon, 153 N. Y. 10, 20, 46 N. E. 1046." In Ledwon's case the controlling issue of fact was whether the deceased was murdered or committed suicide. It does not appear that there was any testimony given by an accomplice; and in the opinion it was said: "The existence of a motive is of little or no importance in a case where there is no proof of the commission of a crime. When circumstances point to guilt, a motive to commit the crime may turn the scale against the accused. Motive alone can never prove guilt, though it may strengthen circumstantial proof of guilt derived from other sources." The ruling in this case is, therefore, not in point as to the question now under discussion.

It was held in Vails' case that " A motive for doing a criminal act is not of itself evidence corroborating the testimony of an accomplice; and the mere fact that one may have an ill will towards a third person, as indicated by his statements, is not evidence corroborating the testimony of an accomplice in an assault on the third person." In the opinion it was said: " While it may be said that the criminal intimacy that had previously existed between Vails [the defendant] and Jones' wife [wife of the deceased] might be regarded as a motive to want to have Jones put out of the way, yet motive for the doing of an act can not of itself be considered as evidence corroborating the commission of the crime, standing alone. The fact that a man may have ill will towards another or wish him harm, and express his dislike in vigorous language, ought not to put him at the mercy of a confessed criminal." The verdict finding the defendant guilty in that case was set aside, because there was no evidence to corroborate the testimony of the accomplice. It appears, therefore, that in the cases of Becker and Vails motive was the only relevant circumstance relied on by the State to support the testimony of an accomplice; and it was consequently held that motive alone would not suffice. In the case at bar the State did not rely solely on motive to corroborate the testimony of an accomplice, but contended that there were other circumstances appearing from the testimony of other witnesses, tending to corroborate Manning's testimony, and connecting the defendant with the commission of the crime charged against him. A brief summary of such circumstances, which the State contends were established, is as follows: The discovery by the United States government agents, in their investigation, of two buildings apparently constructed for the housing and

guarding of negroes, one on the defendant's place, and the other on the place occupied by his sons, Huland and Leroy; the going of the defendant, during the week after the visit of the government agents, to Huland's place where Lindsey Peterson, Will Preston, and Harry Price lived and were at work, and inquiring of them if they desired to go home, and, upon their affirmative answers, directing them to quit work in time to drive some hogs down to the defendant's place, and saying that he would take them to the railroad station either that night or the next morning; the fact that they accordingly went to the defendant's place that afternoon; the going of the defendant that night to the house on his place where Peterson, Preston, and Price were, ostensibly for the purpose of carrying them to the station, their leaving with him in his automobile, such three persons not being afterwards seen alive, and the finding of the dead bodies of several negro men in a river ten days or two weeks after Peterson, Preston, and Price disappeared; and the seeming lack of interest on the part of the defendant, as appears from his statement to the jury, to make effort to ascertain if the bodies found were those of negroes from his or Huland's place. The fact that some of these circumstances may have tended to show motive was no reason why they could not be considered on the question whether they did not also tend to connect the defendant with the commission of the crime for which he was indicted.

"A defendant is entitled to a concrete application of the law to the particular facts of the case, if he presents a timely written request to charge; but he is not entitled to an elaboration of the abstract law upon a single phase of the case to such an extent as will give to it undue prominence." *Harrell* v. *State*, 121 *Ga.* 607 (5), 610 (49 S. E. 703). The court having given full, fair, and correct instruction as to the testimony of an accomplice and the necessity for its corroboration, as appears from the above-quoted extract from the general charge, and in view of all the circumstances, other than motive, upon which the State relied to connect the defendant with the crime charged against him and as to which the request made no reference, the refusal to give the requested instruction was not cause requiring the grant of a new trial.

3. In the 17th ground of the motion error is assigned because the court permitted the witness Clyde Manning to testify, over objection of the defendant, "I went to identify eleven bodies after

they were drowned or killed." In the 18th ground complaint is made that the court erred in allowing Manning to testify, over objection of the defendant, as follows: "I went down to the river with that man and this man here and the sheriff of this county, and seen the bodies, and showed them, when they opened the grave, which was Peter and which was Willie Preston. By Peter I mean Lindsey Peterson. I went with the sheriff to the grave of those men and pointed out the men, which was which, at the grave." The objections are the same in both instances, namely: " (*a*) Such evidence is irrelevant; (*b*) that the identification testified to necessarily involves his saying something and doing something, and is therefore an extrajudicial identification made by this wit-ness not under oath, and is inadmissible, as self-serving and hearsay, (*c*) that such evidence is hearsay; (*d*) that such evidence is an attempt to bolster up the testimony and corroborate the testimony of the accomplice, Clyde Manning, by his own statement and his own conduct outside of the court-room, not under oath, and is not permissible; the rule being that the accomplice can not corroborate himself, and that evidence of what he said or did outside the court-room, not under oath, consistent with his testimony delivered under oath, is inadmissible to sustain him; whereas what he says or does outside the court-room, inconsistent with his testimony, may under some circumstances be admissible to impeach him." As to these grounds counsel for plaintiff in error say in their brief: "If the other crimes were inadmissible, as contended for, then the admission of the evidence set out in this ground of the amended motion was error; and it is so insisted. It is further 'insisted, as pointed out in this ground of the amended motion, that it was an extrajudicial identification of the so-called eleven bodies, that it was hearsay, and that it amounts in fact to permitting the accomplice to bolster up and corroborate himself. All of which objections we submit ought to have been sustained. In Encyclopedia of Evidence, volume 6/935-936, the rule is laid down with authorities supporting it, as follows: 'An identification made out of court by a witness or other person cannot ordinarly be shown, because hearsay.' 'The previous hearsay statements of the witness to identify are not ad-missible in corroboration of his testimony.' It is also well settled that the statements of a witness consistent with his testimony de-livered on the trial are not admissible, and that the witness cannot

be thus bolstered up. Especially is this rule applicable to the testimony of an accomplice, under the familiar doctrine that he cannot corroborate himself."

We have ruled that evidence as to the other homicides was admissible. The identity of the dead bodies found was relevant, and any witness with knowledge of their identity was competent to testify on the subject. The testimony of Manning that he went to identify the bodies and " showed them " — the sheriff and others— which was Peterson's and which was Preston's, was not hearsay. The rules quoted by counsel refer to proof of statements of a witness sought to be shown by another witness — therefore hearsay; and are not applicable here. And, for the same reason, the other rule as stated by counsel does not apply, namely, " that the statements of a witness consistent with his testimony delivered on the trial are not admissible, and that the witness cannot be thus bolstered up." It was not sought to prove by another any statements of Manning. He was allowed to testify merely as to acts of his own. The objections urged to the testimony were not good.

4. In three other grounds of the motion, viz., the 19th, 20th, and 21st, error was assigned on the admission, over movant's objection, of certain testimony of the State's witness, B. L. Johnson, sheriff. His testimony is embodied in the statement preceding this opinion; and to avoid repetition we have indicated, by placing in parenthesis there, the portion of it set forth and excepted to in these grounds. Briefly, it relates to the finding of dead bodies of negroes at several places pointed out by Manning, to identification of them by him, and to wounds on and weights tied to some of them. In the brief for the plaintiff in error it is said, in reference to the 19th ground, that " The evidence here admitted proceeds along the same line just discussed (as to the 17th and 18th grounds), and is subject to the same objections and to all the objections urged upon the admission thereof in this amended ground of the motion, with the additional objection as urged therein that the evidence was inadmissible for the reason that it did not connect the defendant with the identical crime for which he was being tried, and therefore did not fall within the scope of corroborating evidence." As to the 20th and 21st grounds the brief states: " The same reasoning, principles, and decisions heretofore discussed, which condemn the admission of the evidence set out in the 17th,

18th, and 19th grounds of the amended motion, likewise condemn the evidence admitted and complained of in these the 20th and 21st grounds of the amended motion; and there is no need to repeat the argument and decisions contained in our previous discussion."

In view of our rulings as to the objections urged to the evidence set out in the 17th and 18th grounds, and as to the admissibility of evidence of homicides other than that for which the defendant was on trial, the admission of the testimony set out in these grounds, over the objections urged thereto, was not cause for a new trial.

5. The 25th ground of the motion is: "Because the following material evidence was illegally admitted to the jury by the court, over the objections of movant, to wit: the following evidence delivered by Clyde Manning, a witness for the State: 'After Mr. Brown left, Mr. John S. Williams asked us what they asked us, and we told him they asked us about a boy named Blackstrap; and he asked us what we told him, and we told him we didn't know any one named Blackstrap. He didn't seem to be satisfied with Johnnie and what we told him, and he said, " If you ain't told it all, if you all told anything, I will find it out on you." Blackstrap was a boy that Mr. Marvin got last year. I don't know nothing about Blackstrap; he was not there very long before he was killed; he was killed there at Mr. Johnny's house, under a little shelter there in the yard by his house, there in his yard. Mr. John S. Williams asked if Mr. Brown, the Government man, asked anything about Blackstrap. He asked him what did these men ask him, and he told him, Did he know a boy by the name of Blackstrap? and he said he told him ' No sir.' He didn't know of anybody by the name of Blackstrap. Mr. Williams says, ' If you all told anything on me, I will find it out.' John Williams was present when Blackstrap was killed in Mr. Johnny's yard.'

"Movant objected to the admission of such evidence at the time the same was offered, and did then and there urge the following grounds of objection thereto: (a) such evidence is irrelevant; (b) such evidence tends to show the commission of a distinct and independent crime by the defendant, in no way connected with the crime for which the defendant is now being tried on this indictment, and is therefore prejudicial to the defendant; which said objections the court then and there overruled, and admitted said evidence to the jury."

This evidence was objected to as a whole, and certainly not all of it, if any, was subject to the exceptions made.

6-9. The rulings made in these headnotes require no elaboration.

10. There was evidence to authorize the verdict, and the court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur.*