DECKNER-WILLINGHAM LUMBER CO. *et al.* v. TURNER *et al.*

No. 7405. September 27, 1930.

*Bryan & Middlebrooks, Pearce Matthews, Augustine Sams, George B. Rush,* and *Knight & Patterson,* for plaintiffs.

*Jones, Evins, Powers & Jones, A. S. Grove,* and *Robert T. Efurd,* for defendants.

Per Curiam. This is a consolidated cause. A demurrer to each of the cases was overruled, and these judgments were affirmed by this court. *Turner* v. *Security Plumbing Co.,* 165 *Ga.* 479 (141 S. E. 291); *Turner* v. *Deckner-Willingham Lumber Co.,* 165 *Ga.* 652 (141 S. E. 651). Upon the issue in the case, whether the con-

tracts between Jones and Turner and Gallimore, by which the former agreed to sell to the latter the lots involved in this litigation, were made in pursuance of a fraudulent scheme to defraud laborers for work done and materialmen for material furnished for the improvement of these lots, and to enable the owners, under their retention of title to these lots, to obtain the benefit of the improvements put thereon by such labor and material, without paying for the same, the complaining materialmen and laborers, who were seeking in said cause to subject these lots to their liens for material furnished and labor done in the improvement of said lots, introduced the testimony of one Jenkins, in substance as follows:

In October or November, 1925, Jenkins was in the office of Turner on some other business. Turner asked him if he was very busy at that time, and he told Turner that he was not. Turner asked him why it was that he didn't buy an expensive lot and build a big building on it, and make some easy money. He told Turner he did not know how to do it. Turner said he would show him how he could do it without any obligation on his part, if he would turn the matter over to Turner to handle. Turner said he had handled propositions of this kind before, but he had them to pay him a fee of $5,000 in each case. Turner stated that he had handled the Granada apartments for one Langston, and said that Langston had gotten away with $17,500, over and above the $5,000 Langston paid him for his fee. Turner said all the materialmen in Atlanta think they are smart, but they are the softest things he ever saw. Turner said that witness would not have to pay for any of the material unless he just wanted to, and that they would not touch a hair on his head if witness would let him handle the proposition. Witness asked him how it was to be done. Turner said, if witness was worth anything, the day before he signed any contract for lots, he must sign everything he had over to his wife; that after this was done, witness was then to buy the property, and when he did, every materialman would be running after him to sell him material; and that the loan people would be hounding witness to make a loan. Turner said a man with credit can make large deals, but a man with nothing could not pull this off without the aid of some one. Witness told Turner that he could not understand how it was that these things were done. Turner said, "After you buy the lot and make a small cash payment, then arrange a

pay-roll loan, which is very easily done, and draw on that the first of each month from time to time, but you must let me know just exactly what you are doing and when you are doing it, and I will tell you whether you can or can not; only at certain times, if I am handling this for you, will it be necessary for you to see me or come by my office; you would have to finance the first 30 days all your pay-rolls, etc., at your own expense or with your own money; at the first of the second month you would ask for an estimate or a payment for making your pay-rolls; if your pay-roll amounted to $3,000 for the first month, and the material at $5,000, you would not use much material the first month, and it would not be very much on the pay-roll either, but make your pay-rolls show over two or two and a half times the amount they actually are, and if you actually needed $5,000 for pay-rolls and material, if possible, draw $15,000. Out of this $15,000 put the amount that you don't need, and which no one would know about, in your pocket, and distribute the balance among the materialmen, just as small an amount as possible. Do this the first of each month, from time to time until you have gone your limit on the pay-roll money from the loan company. Of course, your building would not be finished at this time, but what would you care? The loan company and the material people would be called together to decide what to do. Some would want to file liens and would do so, but they would be losing their money. Finally you can name some amount that you think would finish the building, and be sure and make it enough, provided the loan company would advance this amount. They would wait a few days before they finally agreed to do so, but they could not do otherwise. Then when you receive this money, handle it in the same manner as you would the other; and of course the loan people and the material people would call another meeting to see what could be done. If you were forced to do so, you could bankrupt and end it all, leaving them with an unfinished building; and you could walk the streets and buy real estate or anything you want, because you would have the cash, or you could take a trip and come back and be as well thought of as you were to start with." Witness questioned Turner as to what could be done with him. Turner said that there was not a law in Georgia that could touch witness; that they could only touch the property, and that there was not one of the creditors who could take the

property because he wouldn't be able; that it could be settled, or this could be adjusted by paying 50 or 60 cents on the dollar, and they would settle it, because they could get nothing; and that this would leave witness an equity or owner of the building.

The foregoing testimony was at first admitted by the auditor, over the objection of the defendant that it was irrelevant and immaterial; but the auditor afterwards sustained the objection and ruled out this testimony. This ruling was not classified either as one of law or one of fact. The plaintiffs moved to recommit the report of the auditor, upon the ground, among others, that this finding was too indefinite, that it failed to set forth the testimony which was offered, and the objections made thereto, and that the ruling of the auditor was not classified either as one of law or one of fact. The court refused to recommit the case. In their exceptions to the auditor's report the plaintiffs except to the above ruling of the auditor in ruling out the above testimony.

The dealings between Turner and Jones on the one part and Gallimore on the other part, began in March, 1926. The vital and controlling point in the case is whether the transactions between Turner and Jones and Gallimore were bona fide purchases of the lots in question, by the latter from the former, or whether it was a scheme by which the lots would be improved by material purchased by Gallimore from various materialmen, for which Gallimore had no intention of paying, and which improvements were to enure to the benefit of Turner and Jones as the owners of the lots involved.

1. Upon the issue whether the contracts between Jones and Turner of the one part, and Gallimore of the other part, were contracts of sale bona fide, with agreements on the part of the owners to advance to Gallimore money or to extend to him credits for the purpose of improving the lots which Jones and Turner ostensibly agreed to sell to Gallimore, or whether these contracts were parts of a scheme by which Gallimore was to employ labor on credit and likewise procure material for the improvement of these lots and not pay for the same, and thus enable Jones and Turner, who retained title to the lots, to reap the benefit of improvements erected thereon by such labor and with such materials, the above testimony of Jenkins was admissible. Evidence that parties charged with having been engaged in a fraudulent scheme to defraud laborers

and materialmen in a building transaction had proposed, or had been engaged in, similar fraudulent schemes, is admissible to show fraudulent intent in the transaction in controversy. To render such evidence admissible, it must be shown that the other transactions were fraudulent, and it must appear that they were so connected in point of time and otherwise with the one in issue as to make it apparent that all were proposed or carried out in pursuance of a common fraudulent purpose. *Engraham* v. *Pate,* 51 *Ga.* 537; *Smith* v. *Wellborn,* 75 *Ga.* 799 (3); *Cowan* v. *Bank of Rockdale,* 159 *Ga.* 123 (125 S. E. 144), 27 C. J. 807, § 739, (4); *Frank* v. *State,* 141 *Ga.* 243 (80 S. E. 1016); *Hill* v. *State,* 148 *Ga.* 521 (97 S. E. 442); *Williams* v. *State,* 152 *Ga.* 498 (110 S. E. 286); *Merritt* v. *State,* 168 *Ga.* 753 (149 S. E. 46); *Sligh* v. *State,* 171 *Ga.* 92 (154 S. E. 799).

(*a*) Similar acts are admissible in evidence, if committed or proposed at or about the same time, and when the same motive may reasonably be supposed to exist, with a view to establish the intent of the defendant in respect to the matters charged against him in the petition. 10 R. C. L. 938, § 105; Jordan *v.* Osgood, 109 Mass. 457 (12 Am. R. 731); Eastman *v.* Premo, 49 Vt. 355 (24 Am. R. 142). This is so in transactions of similar nature or like character in which the defendant had engaged previously to the one in question. Hobbs *v.* Boatright, 195 Mo. 693 (93 S. W. 934, 113 Am. St. R. 709, 5 L. R. A. (N. S.) 906).

(*b*) Intent, good faith, motive, and other such matters relating to the state of a person's mind are usually not easily susceptible of direct proof. But frequently the state of mind accompanying the doing of an act is illustrated by other acts of a similar nature, done or proposed by the defendant in such a way as to indicate a general practice or course of conduct, or as to display motive, knowledge, intent, good faith, bad faith, and a variety of other such things. *Lee* v. *State,* 8 *Ga. App.* 413, 417 (69 S. E. 310); *McDuffie* v. *State,* 17 *Ga. App.* 342 (86 S. E. 821). Other transactions showing fraud are admissible to show intent. *Farmer* v. *State,* 100 *Ga.* 41, 43 (28 S. E. 26); *Wyatt* v. *State,* 16 *Ga. App.* 817 (81 S. E. 802).

2. As the above ruling requires the grant of a new trial, and makes necessary the recommittal of the case to the auditor for the purpose of including such evidence in his report, and making his

rulings upon the issues involved in this case in view of this additional evidence, it becomes unnecessary to deal with other assignments of error.

*Judgment reversed. All the Justices concur, except*

BECK, P. J., dissenting. I am of the opinion that the auditor did not err in excluding the testimony of the witness Jenkins. The conversations and proposals made by Turner, as testified to by the witness, related entirely to a transaction not connected with those under investigation. If admitted and believed, it would tend to prove that H. H. Turner had concocted a plan whereby Jenkins might perpetrate a fraud upon other parties. But this was in relation to an entirely different matter from that under investigation, and quite a while before it. It was irrelevant and immaterial so far as the instant case is concerned, and the auditor properly excluded it.