# Ex parte John Bonner.

*Application for Bail on Habeas Corpus.*

1. *Conspirators—liability of each for acts of others.*—Where a person conspires with others to do an unlawful act, the execution of which makes it probable in the nature of things, that a homicide not specifically designed in the outset might be committed, and which is in fact committed in his absence by one or more of his co-conspirators, while carrying out the common purpose, he is as guilty as though he had been present and personally participated in the homicide.

2. *Conspiracy—existence of question for the jury.*—Whether or not a conspiracy was formed and the defendant a party to it are questions for the determination of the jury from the evidence under proper instructions from the court

3. *Right to bail—revision on appeal.*—On application for bail by a person who is in custody under a charge of murder bail should be refused when the trial judge would sustain a capital conviction by a jury on the same evidence, and such refusal will not be disturbed by a revisory court unless it is clear the lower court erred in its judgment.

Application by John Bonner for the writ of *habeas corpus* to procure his discharge on bail, such writ having been refused him by the Probate Judge of Walker county.

The petitioner, John Bonner, being indicted in the Circuit Court of Walker county, for the murder of Andrew J. Higgins, made application to the judge of probate of that county for bail, which being refused, the application is renewed in the Supreme Court.

Mrs. Elizabeth Higgins, wife of the deceased, testified that petitioner, before the killing, had a fight with Silas Higgins, the youngest son of herself and Andrew J. Higgins, and Andrew J. took the matter up and swore out a warrant against petitioner on account of it; that about a week after the difficulty, petitioner told her, speaking of her family, that he would kill some of the damned set, before a week; that this was about a month before her husband was killed; that in the spring of the year, before, she heard him threaten to kill them; that in the summer, she heard him say, that if her husband said anything to him out of the way, he would knock him down; that on Monday night, between 10 and 12 o'clock, her husband was killed, standing in the door of his own house; that the family—deceased, herself and two daughters, aged 16 and 12 years, respectively,—were asleep in their house, and some one threw a rock against the house and awoke them, and her husband arose and went to the door, and stood on the steps outside, while witness stood inside the door; that her husband had his gun; that something like a cap bursted and her husband shot that way, when she saw the flash of three guns just outside the yard fence; that her husband was shot in the leg, arm and shoulder, and died in a few minutes afterwards, his only exclamation or words being, "Oh yes!"

Cram Swindle testified, that petitioner stayed at his house,—which was some 10 miles from where Higgins lived, the night it was said the latter was killed, and the next morning, he asked witness, if he knew where the Higgins boys were at work, and talked about the Higgins family and his having trouble with them, one way and another, and said, it looked like some of them would die.

But Swindle testified, that petitioner stated, while he was at his father's house, that his business was to find Andrew and Ed Higgins, who had threatened his life, and he wanted to find them.

John Meyers, witness for defendant, testified, that in the

[Ex parte John Bnoner.]

spring of the previous year, he met with petitioner, just after he had bought a little tract of land "down there," and said he had bought this piece of land to move the Higginses to, and, if he could not get them out, by that (means), he was going to kill them all.

Mrs. John Meyer, for the State, testified, that in March of the year Higgins was killed, she met up with petitioner who said, that the Higginses had set in to grieving him, and he was going to town to see what he could have done with them; that he and the old man had just met a while before, that he thought a heap of the old man and had nothing against him; that the old man said he could not move now, but would, when he made his crop, in the fall, and if they did not move, he would move them.

Jim Smith testified, that last May a year ago, he heard John Bonner, the petitioner, in a conversation with old man Higgins, so loud that you could hear him a half mile, say, that if they did not attend to their business, he would kill big, little, old and young.

Rufus Bell testified, that in the first part of the last winter, he heard petitioner say, that if the Higginses kept on molesting him "and get him where he had to," he would shoot one.

Thomas Smith testified, that some time before the old man was killed, petitioner was at witness' house, and witness was endeavoring to get him reconciled with the Higginses, and told him if there was not a reconciliation, they would be the instigation of his death, and he remarked, that 20 men had told him that if he was found dead, not a Higgins would be left in that hollow.

Bill Leonard swore, that a few days before the killing, he was advising John Bonner to get some of his neighbors to fix up the difficulty between him and the Higginses, and he stated, that somebody would have to give a $500 bond between that and Saturday night.

Andrew Higgins testified, that he heard his brother, George, say to petitioner, this year, that he, the petitioner, had been carrying a pistol for his folks and that he had told his father that he meant to kill big, little, old and young, and he replied he did, and he meant it.

John Higgins on his examination stated, that he heard petitioner make the threat, the winter before, that if the Higginses did not leave there, and take those boys away, he was going to kill the old man and Ed Higgins, both.

Sam Key, for the State, swore, that he was near Mr. Higgins' house, the night he was killed,—about 10 o'clock in the

night; that the reason he was there was, that Charley Morris,—a brother-in-law of Bogue Bonner, a brother of petititoner—came by his house, and they went together, to petitioner's house, about dark, and all three went off east of the house and sat down and talked awhile about the Higgins family. The agreement was, that John Bonner, the petitioner, was to leave home the next night and go to one of two places, Carbon Hill, or Crawfords, because he said they would accuse him of the crime, if anything was done at the house, and he would go where he could prove out of it; that "we" agreed that we would go down to Higgins' house, Monday night, and throw a few rocks around the house, and it might cause them to get frightened and move out, and save somebody being killed; that John Bonner said he would go to one or the other of the places, where he could prove out of it; Charley Morris said we would meet there, and throw a few rocks around the house; Charley Morris and witness went to Mr. Davidsons to borrow a gun, parted and agreed to meet next night below Key's field, and go to Higgins' from there, and throw a few rocks, and they would take a scare and move; that the next night, Charley Morris, Bogue Bonner (brother of petitioner) met, and all had guns, to protect themselves; that they went near to Higgins' house, just outside the fence, and Morris and witness got behind stumps and Bogue Bonner behind a bunch of bushes; that Bonner threw two rocks and Morris two; that after this, they heard a gun fire off at the house, when Morris shot his gun twice towards the house, as quick as he could, Bonner fired once and witness once; that after that, witness went to Texas and remained till September. He also testified, that they agreed, before they left, that they would not injure or hurt anybody, but would just go down there, and throw a few rocks around the house.

It was also shown, that petitioner fled, shortly after the crime was committed, but that he was advised to do so by friends, as there was considerable excitement, and on the night of the killing, he went to the house of Cram Swindle, about ten miles from Higgins' place and spent the night,—a place to which he had never gone before.

COLEMAN & SOWELL, for the petitioner.

WM. L. MARTIN, Attorney-General, for the State.

HARALSON, J.—The evidence in this case tends to show, and is not disputed, that the petitioner, John Bonner, bore

[Ex parte John Bonner.]

towards A. J. Higgins, the man that was killed, and other members of his family, a very great grudge, and on a number of occasions, to different persons, and to members of the Higgins family, he threatened their lives, going to the extent, even, of threatening to slay them all, "big, little, old and young." His conduct and his threats towards the deceased and his family had been such, as was shown, as to arouse suspicions, at once, against him, as the perpetrator of the assassination, and he fled the community.

The old man and his family were aroused from sleep, by a wanton trespass upon his own domicil, and he was shot down in the darkness of the night, in the presence of his family. He evidently anticipated the attack. His gun was in readiness, and he fired it off in the dark, for the purpose, as we may suppose, of frightening his assailants away; and immediately, five discharges from guns were fired almost simultaneously at him, and his body was pierced with several balls, killing him almost instantly.

Who perpetrated this bloody deed? Sam Key, a witness for the State, testified, that Charley Morris, a brother-in-law of Bogue Bonner, the brother of the petitioner, who, himself, is shown to have cherished hostile feelings towards the deceased, came to his house, the day before the killing, and procured him to go with him to the house of petitioner, John Bonner; that they three, after supper, walked off, down east of his house, and sat down and talked, the result of which conversation was, that it was agreed that they, Morris and Key, should go, the next night, and throw stones at the house of Mr. Higgins, and, in that way, frighten and run him away from his home. He swore they were to do him no harm, and that such was the express understanding, —more than once repeated. They two met the next night, at the appointed time and place, and carried their guns along, with which to protect themselves, as he stated, but were not to hurt any one with them. The State insists, if their only purpose in going to the old man's premises, was to frighten him away, by casting a few stones at his house, it was unnecessary, for them to have gone armed.

Another fact is shown,—that Bogue Bonner, who appears not to have been present when the alleged conspiracy was formed, appeared the next night, at the apppointed time and place of rendezvous, without any communication with any one, so far as is shown, armed like the others, and prepared to accompany them. And still another fact is urged upon our attention, as tending to evidence the motive of the parties in going to the house of the deceased,—that when the

[Rhea v. The State.]

old man stepped on his door sill and discharged his gun, all three of the confederates, as if by previous arrangement, discharged their pieces in very rapid succession.

If the petitioner entered into a conspiracy to do an unlawful act, the execution whereof made it probable, in the nature of things, that a homicide not specifically designed in the outset might be committed, he would be held as guilty as though he had been present and personally participated in the homicide. This principle is so well understood, and has been so repeatedly and thoroughly considered in this court, as to require no further discussion. It is only necessary to refer to the cases.— *Williams v. State,* 81 Ala. 1; *Martin v. The State,* 89 Ala. 115; *Gibson v. The State, Ib.* 121; *Griffith v. The State,* 90 Ala· 583; *Tanner v. The State,* 92 Ala. 1.

Whether or not there was such a conspiracy formed and petitioner was a party to it, are questions for the determination of the jury, under proper instructions from the court.

For obvious reasons, we refrain from a discussion of the evidence, as we find it in this record. On this testimony, if a jury were to find the petitioner guilty of murder in the first degree, a trial judge would sustain the conviction. Bail was properly refused.— *Ex parte McAnnally,* 53 Ala. 495; *Ex parte Nettles,* 58 Ala. 268; *Ex parte Sloan,* 95 Ala. 22.

Habeas corpus denied.