### 30200.  MOYE v. THE STATE.

Decided March 3, 1944. Adhered to on rehearing, April 1, 1944.

*Thomas A. Jacobs Jr.,* for plaintiff in error.
*Charles H. Garrett, solicitor-general,* contra.

MacIntyre, J. ■ The defendant, Roy Moye, was indicted by the grand jury of Bibb County on February 4, 1943, for the offense of burglary. The indictment alleged in substance that on January 7, 1943, Moye did break and enter the storehouse and place of business of Lester Grady, trading as "Grady's Thrift Mart," with intent to commit a larceny, and that he did steal twenty cartons of cigarettes, fifteen cartons of smoking tobacco, and two cases of snuff. The indictment also alleged two previous convictions on an indictment for burglary in two counts in Bibb superior court, for which the defendant was sentenced to the penitentiary. The defendant was convicted; his motion for a new trial was overruled; and he excepted.

Lester Grady, the person from whom the goods were alleged to have been stolen, testified in effect that he recalled closing his place of business on the night of January 7, 1943; that he arrived there the next morning at about seven-thirty, and the back door was standing open, although he had carefully closed both the front door and the back door the night before; that his stock of cigarettes, tobacco, and snuff had been disturbed, and all of the cigarettes that he had in stock had been taken away; that most of the tobacco was gone, and a considerable part of the stock of snuff; that the back door was fastened by means of a bar, and he was surprised to learn, after his discovery of this burglary, that

it was possible to lift this bar from the back door by using a thin steel or metal instrument, like a saw, and that by inserting such an instrument between the door facing and the door, the bar could be lifted. He testified that he had performed experiments and convinced himself that this could be done. He described his lost property substantially in the language of the indictment, as to the number of cartons of cigarettes, the number of packages of tobacco, and the number of cases and packages of snuff; and said that he had recovered some of the merchandise taken from his store through police officers of the City of Macon; that they brought this merchandise to him from a business place operated by W. W. Brown, located on the corner of Third and Oak Streets in the City of Macon; that he could positively identify some of it when he saw it, and did identify it; that he could identify his tobacco primarily because it was stored on one side of the store, and one or two of the boxes had been eaten by mice; that he had observed the marks made by the mice on these packages, and from his own personal knowledge positively identified one of the packages returned as a package on which the mice had operated and as containing the pattern made by the mice on that package before the store was entered and the merchandise was stolen. On cross-examination, he testified that he positively remembered locking up the store on the night of January 7, 1943; that Harry Sherwood, an employee, had a key to the front door, and that the front door had a double-lock on it. He further testified: "It is possible for somebody that wanted to do so to go in the back of my store and hide, and conceal himself in the store and me not discover it, but I know they did not on the night of January 7, because I went and double-checked on the doors and the store myself. I made a definite search of the building before I closed that night. I looked in the toilet and all in the back of the building." On redirect examination he was questioned on the possibility of someone having been concealed in the store that night and having opened the back door of the store from the inside, and he answered as follows: "I personally closed the back door of my place of business the night before I found the back door open the next morning. I closed the entire store the night before I found the back door open the next morning. When I found the back door open the next morning, I remembered what I did the night

before. I personally looked through the store the night before to see if anybody was concealed in the store anywhere. We had locked someone up in there about two and a half months before this happened. We convicted a negro on that. We had been careless up to that time about checking to see if anybody was concealed in the store, but after that time, I personally, in locking up the store, looked through the store, and I am sure no one else was left in the store that night. There are possibly some two or three places in the store where a person could hide. We had a pretty good stock of goods on the night of January 7, and it was arranged so that there was no particular trouble to see if anyone was hidden or concealed in the store when we went to close up. I am sure that no one was hidden or concealed in the store the night of January 7, because I personally closed the store, and personally checked to see if anyone was concealed in the store, and there was no one in there." On further cross-examination, Grady testified as follows: "There was only one way for them to enter and that was by raising the bar on the back door. I don't know whether anybody had a key made for the door (meaning the front door) or not, but I know the doors were locked the next morning, and it is not likely they would take the time to go around and re-lock all of the doors. It is a double-lock on the front door and it takes a key to lock it. It does not lock itself. It is, of course, possible but not probable that someone could have entered the store by means of a key, and then gone out the door and relocked it with a key. I guess someone could have burglarized the store and then have gone around and relocked the store from the outside when he came out, if he had had a key. The back door was fastened by means of a bar on two flanges. I think an ordinary saw, like a carpenter uses, would have answered the purpose of opening the back door by means of raising the bar. I tried a saw on it and it worked. It was a saw similar to one used by a carpenter. Using a saw to raise the bar on the door would not necessarily make a mark on the door. There was a mark on the door the next morning after this burglary; but I don't know whether it was caused by opening the door that night. My testimony I have given as to how the man entered the store is the only solution that could be made out of it. . . I am as certain that nobody hid themselves in the store the night before as I am that

you are standing over there. It is very remote that anybody hid themselves in the store the night before, and a very small possibility." Where there is evidence that an article or articles were locked up in a store at closing time at night, that no one was locked up in the store at that time, that the article or articles were missing when the store was opened early the next morning, and where the owner of the articles (the occupant of the store) testifies that the only way the store could have been entered was by breaking and entering the same, either by removing a fastening from the back door or by opening the front door, which "had a double-lock on it," with a key or keys, the evidence is sufficient to authorize the jury to find that there was a breaking and entering of the store. *Sirmans* v. *State,* 28 *Ga. App.* 122 (3) (110 S. E. 622). Under the evidence, the jury were authorized to find that there had been a breaking and entering of the house rather than an entering through an open aperture and breaking out of the storehouse. *Humphries* v. *State,* 149 *Ga.* 480 (100 S. E. 637); *Mitchell* v. *State,* 69 *Ga. App.* 771.

■ The next question that arises is, was the accused the man who broke and entered the store and stole therefrom the articles alleged in the indictment? Brown, a merchant in Macon, testified that the list of articles exhibited to him while on the stand consisted of "4 one-dozen cartons of Half and Half smoking tobacco; 1 one-dozen cartons of ten-cent size Ripple tobacco; 1 one-dozen cartons of Prince Albert tobacco; 12 individual cans of Half and Half tobacco; 23 individual packages of Prince Albert tobacco; 24 individual packages of Prince Albert cigarette paper; 15 individual packages of ten-cent Ripple tobacco, and 45 individual packages of five-cent Ripple tobacco. I don't know whether it is right or not, but it is approximately correct. That property is similar to what I bought from the defendant. I turned the property over to the officers. I paid $6.25 for all of that property." He further testified that all of these articles were brought in a zipper bag and a black suitcase; that the defendant did not tell him where he got the "stuff;" that the defendant had tried to sell him some tobacco three or four times about a month before this; that he did not say whether he had it on hand at that time or "whether he could get some. He asked me later did I need any and I said yes, but when he did bring it, I still told him that I didn't need

any. He said he had to leave town and that he would sell it to me at 25 cents a carton, and I gave him $6.25 for it—there wasn't anything but tobacco in the suitcase. He took the empty suitcases on with him." All of these articles bought from the accused on this occasion were turned over to the police the same day. Mr. Bargerson, a police officer, testified in part as follows: that in addition to the list of articles Mr. Brown testified he had bought from the defendant and turned over to the police, he, Bargerson, had recovered 7 packages of Old Gold cigarettes and 3 packages of Phillip Morris cigarettes from the defendant's house; that when they asked him about the smoking tobacco they had recovered from Mr. Brown, the defendant said he had not sold any smoking tobacco to Mr. Brown; that the first time the defendant admitted having sold this tobacco to Mr. Brown was when "we confronted him with a statement" of Ruth Simpson; that he then said he knew it was stolen property, but that he was not guilty of anything except receiving stolen goods; that he would not tell us whether it was a man or a woman from whom he got the tobacco, whether black or white, or whether it happened in Bibb County. Mr. Bargerson corroborated the statement of the prosecutor that there was a slot about an eighth of an inch between the facing of the door and the door of the store, through which a saw could be inserted to remove the bar on the inside of the door, and that the bar when removed would allow the door to open. Ruth Simpson, a witness for the State, testified in part as follows: that she and the defendant were friends; that about 7 or 7:30 o'clock on the night of the alleged burglary, the defendant was visiting in her house, and at that time did not bring any zipper bag or suitcase with him; that he stayed until 10 or 11 o'clock and then left; that he came back later that night with the zipper bag and the suitcase; that he brought them back with him into her room and "told her that he wanted to leave them there;" that she did not know what period of time elapsed "between the time he first left until he brought them back, because she went to sleep;" that he left them in the closet of her room; that she did not know what was in them; and that the bags stayed in the closet until the next Monday night. The zipper bag and black suitcase found at the house of the defendant by the officers were identified by Ruth Simpson as the ones left by the defendant in her room on the night of the

burglary. They were also identified by Mr. Brown as the ones in which the defendant brought the stolen articles to his store on the Monday following the burglary, which had occurred on the preceding Thursday. The defendant, in his statement to the jury, denied his guilt and stated that he had bought the articles from a soldier whom he did not know.

The jury were authorized to find that the property taken by the defendant to the house of Ruth Simpson in the zipper bag and suitcase on Thursday night, the night of the burglary, was the property sold by the defendant to Mr. Brown on the following Monday; that the defendant denied having sold any tobacco to Mr. Brown, and when later confronted by the statements of Mr. Brown and the defendant's girl friend, Ruth Simpson, changed his statement and said he had bought the articles from a soldier whom he did not know, and while he was guilty of receiving stolen goods, he was not guilty of burglary; that the officers returned to the prosecutor only 7, 8, or 10 cartons of tobacco out of about 25 cartons lost by him; that in the cartons returned were some individual packages of George Washington, Prince Albert, Ripple, Bull Durham, and Half and Half tobacco, which brands corresponded with those removed from the store of the prosecutor; and that one of the cartons which the officers recovered from Brown and which had been sold to Brown by the accused, when exhibited to the prosecutor on the stand, was identified by him as follows: "I could positively identify it because I had observed the condition of that carton before the store was broken into; that carton had been eaten by a mouse. I am certain that it is one of the cartons taken from my store on the occasion in question. The reason I know that it came from my store is because it looked like it had been gnawed on by rats. It is unusual. That is the first time that it has happened in my business. I had never had any tobacco gnawed on like that before. Of course, I could not swear that rats did not gnaw on other boxes like this in other stores or places of business."

Although the articles lost did not coincide with the quantity lost, yet they did coincide in variety and brand with those found in the recent possession of the defendant. This coincidence, together with a denial of having sold any articles to Mr. Brown, and then when later confronted by the statement of Mr. Brown and the

defendant's girl friend, the defendant's statement that he had bought the articles from an unknown, colored soldier, followed by the positive identification of the carton of tobacco, which was gnawed on or marked by rats or mice, authorized the verdict. *Jordan* v. *State,* 119 *Ga.* 443, 444 (46 S. E. 679). We think that the jury, who saw and examined the carton marked by the rats, were authorized to determine whether the witness was correct in testifying that he could distinguish it from other cartons of like character and that he identified it as a carton stolen from his storehouse by reason of the particular character of the marking thereon. The marking made by a rat on a carton may make the package distinguishable from other packages the same as if the marking had been made by a man or any other animal; and the jury were authorized to find that the defendant was in recent possession of the articles alleged to have been stolen from the prosecutor. Though the evidence was circumstantial, it authorized a legitimate inference that the defendant broke and entered the store in question and stole therefrom one or more of the articles alleged in the indictment. There was no evidence which authorized the jury to find any other reasonable inferences, such as ordinarily are drawn by ordinary men in the light of their experience in everyday life, save that of the guilt of the accused; and the mere possibility or conjecture that the defendant did not break and enter the store and steal one or more of the articles alleged to have been stolen does not overcome the legitimate inference authorized and found by the jury that the defendant broke and entered the store and stole therefrom one or more of the articles in question. *Mitchell* v. *State,* 69 *Ga. App.* 771 (26 S. E. 2d, 663) ; *Houser* v. *State,* 58 *Ga.* 78, 81 (3). Taking the evidence as a whole, the jury were authorized to find that the defendant was guilty of burglary as charged.

■ The instant indictment alleges a present felony-burglary, and also alleges a previous conviction of another felony. In the trial of such a case the accused must first be found guilty of the present offense of burglary. On this issue, "the defendant enters upon his trial with the presumption of innocence in his favor, which is equivalent to evidence authorizing his acquittal, but this presumption does not necessarily remain until the end of the investigation; it remains until it is rebutted by proof which is suf-

ficient for that purpose.". Richardson v. State, 8 Ga. App. 26 (68 S. E. 518). If the jury find the accused not guilty of the present offense, their deliberations should cease and a verdict of not guilty should be returned. It is then unnecessary for them to consider the court's charge on the subject of punishment. But if the jury find him guilty of the offense for which he· is on trial, the question then arises, what is the punishment therefor? If proof of the allegations of the present indictment, that the defendant had also been convicted of a previous felony, should fix the punishment, if and when convicted for the present offense of burglary, at a minimum of 20 years and a maximum of 20 years, it is not error so to charge the jury. This is true because the Code, § 26-2402, provides that, "Burglary shall be punished by imprisonment in the penitentiary for not less than one year nor more than 20 years." On the other hand, § 27-2511 provides that, "If any person who has been convicted of an offense and sentenced to confinement and labor in the penitentiary shall afterwards commit a crime punishable by confinement and labor in the penitentiary, he shall be sentenced to undergo the longest period of time and labor prescribed for the punishment of the offense of which he stands convicted." In proving the former conviction the State is not compelled to try the previous case all over again and overcome the presumption of innocence, "which is the equivalent of evidence," for when the defendant was convicted on the former trial, and the judgment became final, there was no longer any presumption of the innocence of the defendant of the crime for which he had formerly been convicted. The defendant is not punished anew for previous offenses, but is punished for the last offense committed. He is not sentenced for an offense distinct from the one for which he is last tried and found guilty. The only question in the present case which relates to the conviction of the former offense is whether the defendant is such a person as comes under the Code, § 27-2511. This section treats only of punishments for second felonious offenses by the same person. Thus the proof of the previous offense relates only to the punishment of the last offense committed; and when the fact of conviction of the former felonious offense is made to appear, as here, by the introduction in evidence of the indictment, the verdict of guilty, and the sentence, this being the highest and best evidence of such a fact, and when this evidence is

undisputed and unquestioned by the accused, it is not prejudicial error to instruct the jury to find that the fact of the previous conviction of the defendant has been proved and is to be considered by the jury in fixing the punishment for the second felonious offense, as provided in the Code, § 27-2511, if the jury should find the defendant guilty of the offense for which he is on trial; where the court also charges at great length, that, unless the jury shall find beyond a reasonable doubt that the accused committed the present offense, he must be acquitted. *Stinson* v. *State,* 65 *Ga. App.* 592 (16 S. E. 2d, 111); 16 C. J. 1348; 24 C. J. S. 1171. See also 24 C. J. S. 1165.

There is a motion to review and overrule *Stinson* v. *State,* supra. Upon consideration, this motion is denied.

■ That part of the charge excepted to in special ground 2, when considered with the context, was in the form of a hypothetical statement, and did not express or intimate an opinion as to what had or had not been proved.

■ "Testimony as to other transactions disconnected with that with which the defendant stands charged in the indictment, in both time and circumstance, may be used to show motive, scheme, or plan, and indeed the very nature or animus of the defendant when necessary either to identify and fix the offense upon him, or indeed to disclose the intent with which the accused acted, if there be doubt as to the intent with which the crime was committed. It is true that under the rule the jury are to receive evidence of the commission of previous crimes only for the purposes specified, and not for the purpose of determining by this alone the guilt of the accused. In other words, the jury are forbidden, although they have this evidence of the character and nature of the defendant, to convict him 'upon general principles,' as that expression is sometimes used in general parlance. *Green* v. *State,* 172 *Ga.* 635, 640 (158 S. E. 285); *Frank* v. *State,* 141 *Ga.* 243 (80 S. E. 1016); *Williams* v. *State,* 152 *Ga.* 498 (110 S. E. 286); *Crawford* v. *State,* 49 *Ga. App.* 801 (4) (176 S. E. 92)." *Davis* v. *State,* 58 *Ga. App.* 440, 441 (198 S. E. 800). Following the ruling in *Weeks* v. *State,* 66 *Ga. App.* 553 (18 S. E. 2d, 503), we are constrained to hold that it was not reversible error to allow proof of previous transactions of other burglaries.

■ The State contends that the crime was burglary or nothing.

In his statement to the jury, the defendant "denied going into Mr. Grady's store," and said that he bought the alleged stolen articles, sold by him to Mr. Brown, from an unknown, colored soldier. There was no evidence as to the lesser included offense of larceny from the house, and it was not error to fail to charge thereon. Mr. Grady, the prosecutor, testified in part as follows: That two and a half months before the night in question, a negro had been locked up in the store when it was closed for the night, and he was later apprehended "for that;" that each night thereafter at closing time a diligent search of the store was made to see that no one was locked in the building and that everything was locked and fastened; that on the night in question, the prosecutor himself not only diligently searched, but "double-checked on the doors and store," and saw that the apertures of the store were fastened; and that he knew no one was locked up therein when he closed the store on this night. It seems to us that this is a statement of "collective facts" observed by the witness. The witness could testify to observed perceptive facts for the reason that it was perceptive knowledge of a fact—not a mere conclusion based on fact noted by him, but his recollection of what he observed. The concluding part of the prosecutor's testimony, relating to no one being hidden in the store, was: "I am as certain that nobody hid themselves in the store the night before as I am that you are standing over there. It is very remote that anybody hid themselves in the store the night before and a very small possibility." And because the witness added to his positive statement, that no one was locked in the store, the cautious expression, "it was very remote that anyone hid themselves in the store the night before and a very small possibility," this did not change his testimony to a statement merely of a conclusion. He knew of the interior construction of the store, the arrangement of the stock of goods and fixtures therein, the amount thereof, and all the attendant circumstances. Thus at the time he closed the store he could answer, as *a fact,* that in his judgment no one was in the store. The reason that the witness could so answer was that his answer was based upon perceptive knowledge and this knowledge was derived from observed facts. *Holcombe* v. *State,* 5 *Ga. App.* 47, 56 (62 S. E. 647); Rollings *v.* State, 136 Ala. 126, 128 (34 So. 349); Ex parte John Bonner, 100 Ala. 114 (14 So. 648); Abbott's Select Cases (Evidence) 245;

Abbott's Trial Brief (2d ed.) (Mode of Proving Evidence), 183 (6). Hence we do not think there was any phase of the evidence which would support a verdict that the defendant hid in the store, stole the goods, and then broke out on the occasion in question. Even the defendant himself, in his statement to the jury, did not say that he so did, but as to himself, he denied such a theory, and if no phase of the evidence would authorize the jury to find him or any other person guilty of larceny from the house, it was not error to fail to charge on the law of "larceny from the house."

The fact of additional evidence that one of the clerks had keys to the front door, would not change this situation, for there was no evidence in the remotest degree to connect this clerk or anyone else with the missing articles or the burglary. Even with the additional evidence that the clerk had keys to the front door, there would still be no phase of the evidence which would authorize an instruction on larceny from the house. *Bloodworth* v. *State,* 9 *Ga. App.* 161 (70 S. E. 892).

■ Having decided that, under the evidence, the Code, § 27-2511, fixing the punishment of the second felony at the maximum time for the felony of which the defendant was convicted in the instant case, was applicable, it necessarily follows that § 27-2501, which treats of reducing the punishment of certain felonies including burglary to a punishment as for a misdemeanor, which is a punishment less than that for a felony, is inapplicable.

■ The cases cited in the brief of the plaintiff in error are distinguishable by their particular facts from the instant case.

The judge did not err in overruling the motion for a new trial. *Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*